RILEY, Chief Judge,
concurring in the judgment in part and dissenting in part.
In 2011, Minnesota reduced the rates at which most hospitals were reimbursed for inpatient services covered by Medicaid, but it left the existing rates in effect for “children’s hospitals whose inpatients are predominantly under 18 years of age.” See Act of July 20, 2011, art. 6, § 21, 2011 Minn. Laws 1154, 1235 (codified as amended at Minn. Stat. § 256.969, subdiv. 3c(a)). Fairview Health Services of Minnesota (Fairview) arranged for certain services performed at the University of Minnesota Medical Center, Fairview (UMMC) to be reimbursed at the higher, children’s-hospital rates. Paul Olson says Fairview knew it did not qualify for the exception and was not entitled to the full amount of reimbursements it received, and Fairview should have returned the overpayments, but did not. If so, Fairview might have violated a provision of the Federal False Claims Act that targets “knowingly eon-ceal[ing] ... an obligation to pay or transmit money ... to the Government,”[13] 31 *1076 U.S.C. § 3729(a)(1)(G), and an almost identical provision under Minnesota law, see Minn. Stat. § 150.02(a)(7).[14] I therefore would let Olson go forward with his claims based on those provisions.
The majority holds otherwise because it concludes Fairview did not act “knowingly,” as required by the statute. Ante at 1070-72, 1074-75. See 31 U.S.C. § 3729(a)(1)(G); Minn. Stat. § 15C.02(a)(7); see also 31 U.S.C. § 3729(b)(1)(A) (defining knowledge as actual knowledge, deliberate ignorance, or reckless disregard for the truth); Minn. Stat. § 15C.01, subdiv. 3 (same). I agree with the premise that “[a]n FCA defendant does not act ‘with the knowledge that the FCA requires before liability can attach’ when ‘the defendant’s interpretation of the applicable law is a reasonable interpretation,’ ” United States ex rel. Ketroser v. Mayo Found., 729 F.3d 825, 832 (8th Cir. 2013) (quoting United States ex rel. Hixson v. Health Mgmt. Sys., Inc., 613 F.3d 1186, 1190 (8th Cir. 2010)), at least absent other evidence of knowledge, cf. Minn. Ass’n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1053 (8th Cir. 2002). I also agree the phrase “children’s hospitals whose inpatients are predominantly under 18 years of age,” Minn. Stat. § 256.969, subdiv. 3c(a), is unclear. The crucial question, then, is whether Fairview resolved the ambiguity reasonably.
The majority gives that question short shrift, answering as if Fairview’s interpretation was just that the children’s-hospital unit at UMMC qualified for the exception to the reimbursement rate cut. Ante at 1070, 1071-72. If that were true, I would probably agree Fairview’s interpretation was reasonable. But Fairview actually obtained an exemption from the reduced rates for all inpatients younger than eighteen at UMMC, whether admitted to (or treated in) the children’s unit or elsewhere in the hospital.[15] Because not all children at UMMC go to the children’s-hospital unit, according to Olson, that means Fair-view was reimbursed at the higher children’s-hospital rates for services provided by other UMMC units. Olson says some of those services, like birth services for newborns, maternity services for mothers younger than eighteen, and appendectomies for children, normally would not be provided at a children’s hospital at all.[16] Fairview’s purported entitlement to the reimbursements thus required reading *1077 “children’s hospitals whose inpatients are predominantly under 18 years of age” to mean “generalist hospitals whose inpatients are predominantly adults, to the extent they also treat children.” Because that interpretation is patently unreasonable, however ambiguous the statute, Fairview must have known it was getting overpaid. So the requirement of “knowing” conduct is no reason to dismiss Olson’s § 3729(a)(1)(G) claims.
Fairview identifies no others. Its entire argument on appeal is directed at subsections (a)(1)(A) and (B) — indeed, subsection (a)(1)(G) is not mentioned once — and Fair-view centers on the idea that Olson’s allegations failed to establish Fairview knowingly made false claims for government money. Unlike those provisions, subsection (a)(1)(G) by its terms does not require the existence of any false claims, only the “concealing],” “avoiding],” or “decreasing]” of “an obligation” to the government, accord Minn. Stat. § 150.02(a)(7), so it is beyond the reach of Fairview’s challenge. I see no reason to search for other, unbriefed theories to justify throwing out Olson’s whole case at this early stage.
In particular, unlike the majority, I would not reach out to decide subsection (a)(1)(G) requires some sort of “fraudulent conduct” that necessarily implicates the requirement that fraud be pled with particularity. Ante at 1074-75. See Fed. R. Civ. P. 9(b). Not only has that issue not been raised or addressed by either party, but the majority’s position is doubtful at best. True, this court has generalized that “[bjecause the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b).” United States ex rel. Joshi v. St. Luke’s Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006). But such statements come in decisions dealing with False Claims Act provisions involving conduct that clearly looks like fraud. See, e.g., id. at 554, 556 (addressing allegations a hospital and doctor billed the government for medicine and supplies not actually given to patients and lied about nurse anesthetists’ work being directed or supervised by a doctor); United States ex rel. Kinney v. Stoltz, 327 F.3d 671, 672-74 (8th Cir. 2003) (involving false certifications that ambulance runs were medically necessary); see also 31 U.S.C. § 3729(a)(1)(A)-(B) (targeting “false or fraudulent claim[s]” and “false record[s] or statement[s]”). When an alleged False Claims Act violation does not depend on fraud, on the other hand, there is nothing to trigger Rule 9(b). See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 238 n.23 (1st Cir. 2004) (“A retaliation claim under 31 U.S.C. § 3730(h) does not require a showing of fraud and therefore need not meet the heightened pleading requirements of Rule 9(b).”).
Even though subsection (a)(1)(G) does not by its terms require falsity or deception, the majority insists it cannot be violated absent “fraudulent conduct” because the False Claims Act is an “antifraud statute” and subsection (a)(1)(G) appears alongside its other substantive prohibitions.[17] Ante at 1073-74.1 do not doubt the act is primarily concerned with fraud, but that does not mean Congress could not use the same law to prohibit other, closely *1078 related misconduct (or anything else Congress chose to include) as well. The legislative history the majority invokes to suggest the False Claims Act reaches nothing but fraud' — general references to “fraud” in prefatory statements by the Senate Judiciary Committee about the purpose of bills amending various parts of the False Claims Act, see S. Rep. No. 111-10, at 1-2, 4; S. Rep. No. 99-345, at 1 — is a flimsy foundation for such a bold claim. Ante at 1073 & n.ll. In fact, some of that history carries no weight at all here, because it addressed a version of the act in which the precursor to subsection (a)(1)(G) actually did require “mak[ing], us[ing], or causing] to be made or used, a false record or statement.” See 31 U.S.C. § 3729(a)(7) (2006) (emphasis added); S. Rep. No. 99-345, at 18-19, 39. The root of my disagreement with the majority, of course, is that the law has since changed and the current statute no longer contains such a requirement when it comes to liability based on “concealing]” or “improperly avoiding] or decreasing]” obligations to the government.[18] 31 U.S.C. § 3729(a)(1)(G) (2012); accord Minn. Stat. § 15C.02(a)(7).
The majority also cites the Supreme Court’s recent reminder that “[t]he False Claims Act is not ‘an all-purpose antifraud statute,’ ” Universal Health Servs., Inc. v. United States ex rel. Escobar, — U.S. -, 136 S.Ct. 1989, 2003, 195 L.Ed.2d 348 (2016) (quoting Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008)), declaring that “[i]f the FCA is not meant to cover all types of fraud, it would be unreasonable to assume it covers both fraudulent and nonfraudulent conduct.” Ante at 1073-74. Although the premise is undeniable, see 31 U.S.C. § 3729(a)(1) (listing specific prohibited acts), the majority’s conclusion is a complete non sequitur. There is nothing unusual, much less irrational, about a law that prohibits some, but not all, fraud and also reaches some other misconduct. The U.S. Code is replete with such statutes, some of which we deal with routinely. See, e.g., 8 U.S.C. § 1325 (prohibiting lying or concealing facts to gain entry to the United States and fraudulently getting married or starting a business to evade the immigration laws, as well as entering the United States at an improper time or place or without examination and inspection); 18 U.S.C. §§ 1961-62 (targeting “racketeering activity,” which includes mail and wire fraud, among other listed varieties, as well as dozens of other offenses).
The majority’s protests notwithstanding, all of this is not to say “the language at issue here” does not “encompass! ] fraudulent conduct.” Ante at 1074. Of course it does. The point is that it might also encompass other things[19] — the fact that *1079 some concealment is fraudulent does not imply it all is- — so pleading a violation of subsection (a)(1)(G) does not necessarily involve “alleging fraud or mistake,” which is what must be done with particularity. See Fed. R. Civ. P. 9(b). As to whether the nonfraudulent things Olson says Fairview did rise to the level of “concealing]” an obligation, cf. In re NationsMart Corp. Sec. Litig., 130 F.3d 309, 315 (8th Cir. 1997) (“The only consequence of a holding that Rule 9(b) is violated with respect to a [nonfraud] claim would be that any allegations of fraud would be stripped from the claim. The [other] allegations ..., which are at the heart of [the] claim, would survive.”), I have my doubts. But Fairview does not raise the issue of what exactly the term “concealf ]” means in this context, so I would leave the matter to be properly argued and decided on remand or in another case.
I therefore respectfully dissent from the judgment affirming the dismissal of Olson’s claims under subsection (a)(1)(G), his conspiracy claims to the extent they relate to the same alleged violations, see 31 U.S.C. § 3729(a)(1)(C), and his parallel state-law claims, see Minn. Stat. § 15C.02(a)(3), (7). As to the rest, although I disagree with the majority’s reasoning and conclusion that Fairview did not act knowingly, I concur in the judgment because violations of subsections (a)(1)(A) and (B) do require fraud, accord Minn. Stat. § 150.02(a)(1), (2), and Olson does not allege any such fraud with sufficient particularity in his present complaint or his proposed amendments, see Fed. R. Civ. P. 9(b).[20]

. As the majority notes, ante at 1073 n.9, parts of the statutory definition of an “obligation” resemble the interpretation this court adopted back when the term was undefined. Compare 31 U.S.C. § 3729(b)(3), with United States v. Q Int'l Courier, Inc., 131 F.3d 770, 773 (8th Cir. 1997). Indeed, in its summary of the bill that added the definition, the Senate Judiciary Committee singled out our reading as representing the narrow end of the “spectrum” of obligations the new provision was meant to reach, with the other extreme being "the instance where there is a relationship between the Government and a person that results in a duty to pay the Government money, whether or not the amount owed is yet fixed.” S. Rep. No. 111-10, at 14 & n.13 *1076 (internal quotation marks omitted). As reflected in that explanation, the key points where the statute differs from our old formulation include its clarification that an obligation need not be "fixed,” as well as its explicit inclusion of obligations "arising ... from the retention of any overpayment.” 31 U.S.C. § 3729(b)(3).

. Absent any indication the parallel lan- ' guage means different things in the two statutes, I agree with the majority’s approach of addressing Olson's claims together and following federal case law. Ante at 1069 n.6. For simplicity’s sake, I therefore phrase the rest of my analysis in terms of the False Claims Act.

. Similarly, when the Minnesota legislature later retroactively changed the law to exempt Fairview unambiguously — after the Minnesota Department of Human Services (department) (prompted by Olson) conducted an audit, decided the exception as written did not cover Fairview, and asked for its money back- — the amended statute carved out all "admissions of children under 18 years of age” at UMMC, not just admissions to the children’s-hospital unit. See Act of May 20, 2014, art. 24, § 13, 2014 Minn. Laws 2085, 2348 (codified at Minn. Stat. § 256.969, subdiv. 3c(d)).

.The majority emphasizes that, according to a secondhand account Olson received from a colleague, Fairview told the department that the exemption would only affect reimbursements for services provided to children admitted to UMMC’s children’s-hospital unit. Ante at 1067. As far as Olson’s subsection (a)(1)(G) claims are concerned, that makes no difference. However Fairview’s lobbyists initially sold the exemption to the department, Olson’s claims are about the reimbursements Fair-view actually received after the exemption was implemented, and according to Olson’s allegations' — which, for now, we must take as *1077 true, see, e.g., Hixson, 613 F.3d at 1188 — the lobbyists' assurances were wrong.

. Contrary to the majority's premise, the other provisions of § 3729(a)(1) are not all obviously confined to "fraud against the government,” at least in the sense of requiring anything misleading or deceptive. Subsection (а)(1)(D), for example, forbids having control over government property and failing to deliver all of it, while subsection (a)(1)(F) targets people who buy public property or accept it as collateral from someone in the government or the military who cannot legally sell or pledge it. Accord Minn. Stat. § 15C.02(a)(4), (б).

. What is more, in the report on the bill that effected that change, the section that was specifically about the False Claims Act described it as "an extraordinary civil enforcement tool used to recover funds lost to fraud and abuse," not just fraud. S. Rep. No. 111-10, at 10. And when that report got even more specific about the proposed changes to subsection (a)(1)(G), it opined that the amended provision would reach "any knowing and improper retention of an overpayment beyond or following the final submission of payment as required by statute or regulation,” which does not sound like it requires fraud. Id. at 15 ("[T]he violation of the FCA for receiving an overpayment may occur once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment.”).

. Even so, the majority need not worry that subsection (a)(1)(G), if not limited to fraud, would threaten "an unreasonable levy against individuals guilty only of ‘knowingly’ receiving an overpayment from the government fisc,” ante at 1074; see also 31 U.S.C. § 3729(a)(1) (prescribing steep penalties for False Claims Act violations), for the simple reason that the provision does not actually punish people for just passively receiving ex *1079 tra money from the government. Rather, liability plainly requires doing something culpable in order to get away with keeping an overpayment, namely “concealing]” or “improperly avoiding] or decreasing]” a duty to give it back. IcL; accord Minn. Stat. § 15C.02(a)(7).

. The Supreme Court’s recent decision in Universal Health Services, Inc. v. United States ex rel. Escobar, - U.S. -, 136 S.Ct. 1989, does not affect my evaluation of Olson’s claims under subsections (a)(1)(A) and (B), because it addressed a different sort of False Claims Act case. Universal Health was about “implied false certifications,” claims for payment that do not say anything untrue but are misleading because of what they leave out, see id. at -, 136 S.Ct. at 1999-2001, whereas Olson’s claims are based on the rule that when a government contract is secured through fraud, claims for payment later submitted under the contract can count as false claims even if they are not fraudulent themselves, see United States ex rel. Simpson v. Bayer Healthcare (In re Baycol Prods. Litig.), 732 F.3d 869, 876 (8th Cir. 2013); cf. United States ex rel. Kraxberger v. Kan. City Power & Light Co., 756 F.3d 1075, 1081 (8th Cir. 2014) (distinguishing between false-certification and ffaud-in-the-inducement arguments) 1 Because the fraud that matters for Olson's theory is whatever initially induced the government to enter into the ongoing relationship, see In re Baycol Prods., 732 F.3d at 876-77, not any misrepresentations — implicit or explicit — in the claims for payment themselves, the Court's analysis of when such claims can be actionably misleading is irrelevant here.