**Jackie SCOTT, on Behalf of the United States of America and on Behalf of the State of Iowa, Plaintiff/Relator,**

**v.**

**William M. BONNES and Angela Ganzer–Bovitz, Defendants.**

**No. 3:13–cv–00102–JEG**

United States District Court, S.D. Iowa, Davenport Division.

Signed July 8, 2015

Matthew James Reilly, Eells & Tronvold Law Offices PLC, Cedar Rapids, IA, for Plaintiff.

Adam D. Zenor, Joseph F. Moser, Grefe & Sidney PLC, Des Moines, IA, Robert Scott Gallagher, Peter Glenn Gierut, Gallagher Millage & Gallagher PLC, Bettendorf, IA, for Defendant.

## ORDER

JAMES E. GRITZNER, Senior Judge

This matter now comes before the Court on a Motion and a Renewed Motion by

Defendant William M. Bonnes (Bonnes) to Dismiss claims brought by Relator/Plaintiff Jackie Scott (Scott) under the False Claims Act (FCA), 31 U.S.C. § 3729 et seq. and the Iowa False Claims Act (IFCA), Iowa Code § 685 et seq. Scott resists. The parties have not requested a hearing, and the Court finds no hearing is necessary in resolution of the motions. The motions are fully submitted and ready for disposition.

## I. BACKGROUND

"In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences most favorably to the complainant." *United States ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir.2012).

This case now involves individual liability for false claims submitted to Medicaid. Medicaid funds medical and health-related services for low income individuals in the United States. In Iowa, Medicaid is funded by both the United States and the State of Iowa. While Iowa establishes and administers its own Medicaid program, there are certain mandatory benefits Iowa must cover along with optional benefits it may choose to provide. Iowa provides Medicaid coverage for both residential care facilities (RCFs) and habilitation services. RCFs provide community-integrated programs offering licensed residential treatment services to adults with disabilities. Habilitation services are home and community-based services designed to assist members who have functional deficits with self-help, socialization, and adaptive skills necessary to reside successfully in home and community-based settings. Services available through the program include case management, home-based habilitation, day habilitation, pre-vocational services, and supported employment.

Community Care, Inc. (CCI) offered programs and services including habilitation services to clients with developmental and/or intellectual disabilities, mental illness, and brain injury in the Iowa counties of Clinton, Scott, Jackson, Jones, Cedar, Linn, Marion, Chickasaw, and Howard, and has provided services to hundreds of clients through six programs including three RCFs. During times relevant to this lawsuit, CCI had three RCFs in Iowa: the Fairview RCF in Anamosa, the Marion RCF in Knoxville, and the Heritage RCF near New Hampton in Chickasaw County.

Scott began working for CCI on December 12, 2011, as the administrator of the Fairview RCF; in the late spring of 2012, Scott had the added responsibility of overseeing other services provided by CCI. At times relevant to this action, Bonnes was President and CEO of CCI. Both Bonnes and Angela Ganzer–Bovitz[1] (collectively, Defendants) were decision makers at CCI.

Each RCF sent a monthly occupancy report to Amanda Bratthauer (Bratthauer), a CCI corporate office controller stationed in DeWitt. Each occupancy report listed those clients who were in the respective RCF buildings at midnight each night and those clients who were out of the buildings due to hospitalization or home visit. Day habilitation, county, private pay, and private insurance would be billed based on these reports. Bonnes would bill the full day habilitation fee for full day

---

1. Paragraph 28 of both Scott's original and first amended qui tam complaints, ECF Nos. 1 and 4, identify Ganzer–Bovitz as CCI's COO. Paragraph 28 of Scott's second amended complaint, ECF No. 43, is identical to paragraph 28 of the original and first amended complaints but for the removal of the title "COO" after Ganzer–Bovitz' name. The second amended complaint does not otherwise specifically identify Ganzer–Bovitz' title.

habilitation clients whether or not day habilitation had been provided or documentation had been completed. Day habilitation was billed on a daily rate and not on a per-hour rate as it should have been. Billing between all three RCFs and the corporate office was completed in the same manner and with the knowledge and consent of Bonnes and Ganzer–Bovitz.

According to Scott, Ganzer–Bovitz told Scott to make sure her employees were recording enough time for services on the day habilitation sheet but never told Scott to ensure the employees actually performed those documented services. On February 16, 2012, Scott attended a day habilitation training session conducted by Erin Erdman, the quality assurance coordinator at the Heritage RCF. Scott requested the training because she had not been fully trained on day habilitation but had only received training from Ganzer–Bovitz that focused solely on documentation and not on providing services to the patients. Prior to the training, CCI billed Medicaid for full day habilitation even though few habilitation services were being provided and little or no documentation was being completed. At the February 2012 training, employees were instructed to document services provided in fifteen-minute, rounded-up increments and to document ongoing supports even though RCFs were paid to provide those services anyway. Employees were later informed that they could document eight hours of overnight habilitation services, even though the patients were sleeping—a service for which CCI was already being paid. Ganzer–Bovitz insisted that employees document in this manner.

The day habilitation sheet for each facility was completed by the social worker; the goals on the client's day habilitation sheet were taken from the client's individual care plan (IPP). The first and second shift staff members, which included one certified medication aide (CMA) and one direct support professional (DSP), divided up the day habilitation and would document the services that had been provided. They would also document, as having been provided, those services that were supposed to have been provided but had not been provided. Examples of day habilitation services would be for the CMA to ask the clients about their medications, dosages, and the side effects, and then document the client's responses and record how long it took to complete the task. Time leftover in an eight-hour shift was to be documented under ongoing supports or goals/tasks (activities, transportation, etc.), which were not commonly completed due to the amount of time it took the CMA to review all the medications, dosages, and side effects with the client. State regulations require medication to be provided within one hour before to one hour after the scheduled medication time. Given the time constraint within which the CMA had to pass medications for all clients, the CMA would not have time to review all medications, dosages, and side effects with each day habilitation client; nonetheless the service was documented as having been provided. Day habilitation goals or tasks include things such as greeting the designated client with a cheerful smile, asking how work was, or how the client felt. A day habilitation goal for improving hygiene, for example, may require asking whether the client showered or brushed her/his teeth, which may have been a two-minute conversation but was documented as having taken fifteen minutes.

During day habilitation training, employees were told that although day habilitation clients needed no additional care than county-funded clients, more documentation was required for day habilitation-funded clients and that the day habilitation sheet was a receipt for the government in case of an audit. Ganzer–Bovitz provided

staff with specific words to use in the documentation in the hopes of ensuring payment, such as having the staff member document a conversation with a day habilitation-funded client about taking a shower as a training session. Day habilitation and county clients had medication goals and were offered activities such as anger management and self esteem groups; there were no activities offered or planned solely for the day habilitation clients. Ganzer–Bovitz had a rule that tasks or goals for day habilitation clients could not take place in their bedroom.

CCI did not have specific staff assigned to provide day habilitation. Instead, Ganzer–Bovitz mandated that all day habilitation services had to be provided by one CMA and one DSP on the first and second shifts, and by one DSP (no CMA) on the third shift. This staffing pattern was maintained despite multiple reports to Bonnes and Ganzer–Bovitz that the staff level could not provide the services that were being billed. On the first and second shifts, CMAs and DSPs shared the responsibility of completing day habilitation documentation; on the third shift, the DSP was solely responsible for completing all documentation.

Scott and others had repeatedly voiced concern to Ganzer–Bovitz and Bonnes about the need for additional staff. Scott asked several times to hire someone for transportation so that the existing staff could remain at the facility; Scott was told that she would never be able to hire someone dedicated solely to transportation and that Scott needed to make the mandated staffing pattern work. Ganzer–Bovitz repeatedly asked Scott why Scott could not make the staffing pattern work since the other two RCFs had more clients and were able to make it work. However, the other RCFs similarly billed for services not provided.

Many clients had to be transported to doctors' appointments located thirty minutes away. Ganzer–Bovitz required that client transportation time be documented as day habilitation time even when there was no communication with the client during transport. Some clients needed supervision during doctors' appointments, which meant that staff had to wait in the doctor's office, thus leaving only one scheduled person to manage the floor at the facility. While other staff helped out as much as possible, this help made completion of day habilitation documentation nearly impossible. Ganzer–Bovitz and Bonnes were aware of this staffing deficit but nonetheless continually billed the maximum allowable amount for day habilitation. Bonnes signed and submitted the false billings.

Ganzer–Bovitz and Bonnes directed employees to document time for services that were not actually performed so that CCI would have documentary support for services for which it billed. Ganzer–Bovitz also directed employees to falsify client acuity to garner more reimbursement and threatened employees with termination for questioning the practice. An employee that asked Ganzer–Bovitz whether to document for day habilitation while the client was asleep was reprimanded for inquiring about proper documentation and billing. Another employee who complained to Bonnes about being ordered to commit fraud by documenting time for services that were not actually performed was instructed to quit if the employee did not like following orders.

Yet another employee's relationship with Ganzer–Bovitz and Bonnes suffered when the employee refused to commit fraud. Employees were even instructed to complete documentation reflecting that day habilitation had been performed on days when the employee was out of the office all day and had no client contact.

Still another employee asked that CCI not bill time for services not provided; nonetheless, at Bonnes' insistence, the time was billed. The same employee, after meeting with Bonnes and Ganzer–Bovitz to inform that he/she would no longer document for habilitation services not actually provided, was threatened with termination if CCI lost one dollar. Multiple requests were made to Bonnes and Ganzer–Bovitz for approval to hire staff to actually provide the services for which CCI billed. Those requests were denied, and Bonnes and Ganzer–Bovitz continued to insist that employees document that day habilitation services had been provided even though they knew there was inadequate staff to actually provide such services. In fact, Bonnes and Ganzer–Bovitz eventually cut staffing but required staff to document the same number of service hours.

Ganzer–Bovitz directed that the employees would be written up if they did not complete their documentation showing services had been provided whether or not those services actually had been provided. Due to constraints of the Health Insurance Portability and Accountability Act (HIPAA), staff could not take day habilitation paperwork home to complete, and Ganzer–Bovitz would not allow Scott to authorize staff members to stay on the clock after their scheduled shifts to complete their day habilitation documentation. Thus, many staff members would clock out and stay at the facility to work on their day habilitation documentation due to the fear of getting written up or terminated if they did not submit their documentation. Ganzer–Bovitz expected documentation to be completed within one week of the service provided even though it was rare for a staff member to be up-to-date on day habilitation documentation; furthermore, the staff never completed the four hours of services that were needed to bill full day habilitation because of the lack of staff. Instead, staff provided about fifteen minutes of day habilitation service and the rest of the time was documented as ongoing supports.

At the Fairview RCF, approximately seventeen clients were entitled to habilitation services. Forty staffing hours were allotted on a given day. Since much staff time was spent performing tasks for clients not entitled to habitation services, performing services already paid for as part of an RCF, and transporting patients out of the facilities, essentially every day more time was billed for habilitation services than the total number of actual staff hours worked. It was the same way at the other CCI facilities. The CCI facilities did not have enough staff to provide the maximum day habilitation services nor was there enough time for the staff members to document such services, yet CCI billed for such services.

After an audit on September 6, 2012, Scott informed Ganzer–Bovitz that she could not document ongoing supports or overnight hours, and therefore the facility would be unable to bill for the full amount of day habilitation hours. Ganzer–Bovitz mentioned the possibility of Scott hiring a part-time educational coordinator to help facilitate groups for habilitation services because the facility was not meeting the documentation needed to bill for day habilitation and neither were CCI's other two RCFs. Scott also tried to hire a CMA to work the overnight shift so there would be a medication passer on duty, but Ganzer–Bovitz told Scott that clients never asked for night medication because the clients knew there was not a medication passer on duty during the third shift. Scott had a CMA on third shift for a short period of time but had to pay that CMA at the DSP wage of $9.00 per hour instead of the CMA wage of $12.00 per hour. Without a CMA on the third shift, Scott had to make a CMA call schedule, so that in the event a

client needed medication during the third shift, the on-call CMA was required to come to the facility to pass out the medication, otherwise the client had to go to the emergency room. Most CMAs lived more than thirty minutes away from the Fairview RCF.

When a client moved into an RCF, the case manager/discharge planner sent a Notice of Decision (NOD) identifying the payor source, such as day habilitation or county funding. The RCF then sent the NOD to Bratthauer at the DeWitt office where billing for day habilitation was completed. Invoices were sent out when needed for billing. CCI, through Bonnes, billed for full day habilitation without providing habilitation services (due to lack of staffing) and without proper documentation (due to lack of training, wrong information presented in training, and the demands of Bonnes and Ganzer–Bovitz that such documentation include services that were not provided). For years at all three CCI RCFs, with the direction, knowledge, and consent of Bonnes and Ganzer–Bovitz, CCI improperly billed from the occupancy report at a daily rate (not a per-hour rate). For example, on September 4, 2012, Bonnes, in his capacity as CCI's President and CEO, submitted a financial and statistical report for habilitation services to the Iowa Department of Human Services claiming units of service had been provided knowing that such services had not been provided. Multiple former employees opined that CCI performed between 0% to 10% of the services Bonnes reported. The September 6, 2012, audit (and previous audits) focused solely on documentation and not on whether work was actually being provided. The audit questioned documentation for ongoing support services and eight hours of overnight habilitation services, which Ganzer–Bovitz tried to dismiss as a training issue. Two other internal audits showed increased and significantly better documented day habilitation

services even though nothing had been done differently since the two prior audits. Responding to Ganzer–Bovitz' comment that the problem was a training issue, Scott, and Mindy Winekauf (Winekauf), the quality assurance coordinator at the Fairview RCF, reminded Ganzer–Bovitz how they had been trained to bill ongoing supports and eight-hour overnight habilitation services. Scott then sent Defendants the email that clarified the overnight billings. Two hours after Scott sent the email to Defendants, Bonnes' assistant called Scott and informed Scott that Bonnes wanted to meet with Scott. When Scott met with Bonnes on Monday, September 10, 2012, Scott was suspended pending an investigation.

Bonnes and Ganzer–Bovitz went to the Fairview RCF on September 11, 2012, and interviewed Winekauf and social worker Peter Mullaney (Mullaney). Winekauf reiterated how the employees were trained and said they were following that training at the Fairview RCF. Bonnes offered Mullaney a $1000 per month salary increase to work as interim administrator while they looked for Scott's replacement. Later the same day, Bonnes' assistant called Scott and told her that Bonnes wanted to meet with her on September 12. When Scott went to the DeWitt office on September 12, Bonnes terminated Scott.

Scott asserts she was terminated for her efforts to prevent Defendants from continuing to make false claims and that Bonnes and Ganzer–Bovitz were the decision makers. Scott alleges that while working at CCI, she acquired firsthand knowledge of acts or omissions knowingly committed by Defendants in an attempt to secure federal funds by billing for services that had either not been provided at all or not provided to the extent declared.

In September 2012, based on information provided by Scott, the Iowa Medicaid

Enterprise (IME) of the Iowa Department of Human Services, which participates in federal and state Medicaid programs and contracts with health care providers such as CCI, began an administrative review of CCI's Medicaid service claims and subsequently referred the matter to Iowa Medicaid Fraud Control Unit. On September 19, 2013, Scott filed this qui tam action on behalf of the United States against CCI, Bonnes, and Ganzer–Bovitz alleging they knowingly submitted millions of dollars worth of false claims to the Medicaid program for health care services never rendered and that they unlawfully terminated Scott in violation of the FCA.

Pursuant to a search warrant executed by federal authorities on CCI's premises in October 2013, the IME determined a credible allegation of fraud existed against CCI and, as required by federal law, the state Medicaid agency suspended payments to CCI. On October 11, 2013, however, CCI and IME entered into a settlement agreement to resolve the fraud allegations, under the terms of which CCI waived its right to an administrative hearing and agreed to retain an independent third-par-

ty management firm to oversee its operations during the investigation; in exchange, IME lowered the partial payment suspension to 35%. On November 2, 2013, IME agreed to further lower the partial payment suspension to 20%. On March 5, 2014, the third-party management firm left CCI.

On February 2, 2014, Scott amended her qui tam complaint to include the State of Iowa (the State) and to assert that the acts committed by CCI, Bonnes, and Ganzer–Bovitz also violated the Iowa False Claims Act, Iowa Code § 685.[2] On November 25, 2014, Bonnes was served with the summons and amended complaint,[3] and on December 15, 2014, counsel filed an appearance on behalf of Bonnes.

On February 4, 2015, this Court accepted a Settlement Agreement against CCI and in favor of the Plaintiffs in the amount of $9,184,078 directing distribution of the Withheld Funds as follows: United States—38.5%, State of Iowa—35.9%, and Scott—25.6%. Partial judgment was entered on February 9, 2015, in favor of the State, the United States, and Scott, and

---

**2.** On March 31, 2014, the Iowa Department of Human Services filed an application in the Iowa District Court for injunctive relief under Iowa Code § 249A.44 to stop CCI from transferring any property. The State intervened in this action on April 7, 2014. In May 2014, CCI stopped providing Medicaid services to members. Between the execution of the search warrant in October 2013 and May 2014 when CCI stopped providing Medicaid services, IME withheld $1.5 million (Withheld Funds). The federal and state portions of the Withheld Funds were held in the Federal Medicaid Trust Fund and the analogous State account, respectively.

On April 3, 2014, the Iowa District Court for Polk County substantially granted the application for injunctive relief ordering CCI to periodically disclose its assets and liabilities to the State and to seek court approval before transferring any of its property or taking any action inconsistent with the State's ability to

recover overpayments of Medicaid funds. On July 9, 2014, following an evidentiary hearing on a joint motion by CCI and the State for appointment of a receiver, the Iowa District Court appointed MorrisAnderson receiver for CCI (the Receiver) and ordered that the Receiver would acquire first priority payment from CCI's assets. DeWitt Bank & Trust Company, a CCI secured creditor that had intervened in the state court action, petitioned for interlocutory review of the injunction to the Iowa Supreme Court. *See Dep't of Human Servs. v. Cmty. Care, Inc.*, 14–1522 (Iowa S.Ct.). The Iowa Supreme Court issued its opinion on April 10, 2015, vacating the injunction and holding that no provision of the Iowa Code authorized charging the expenses of a receiver against a secured creditor. *See Iowa Dep't of Human Servs. v. Cmty. Care, Inc.*, 861 N.W.2d 868, 877 (Iowa 2015).

**3.** On October 7, 2014, a waiver of service was filed on behalf of CCI.

against CCI. Partial J., ECF No. 31. The Court granted a motion by the State, the United States, and Scott to distribute the Withheld Funds in the manner designated by the Court's February 4 Order.

On February 9, 2015, Bonnes filed a pre-answer motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) asserting Scott failed to state a claim against Bonnes upon which relief may be granted. On March 31, 2015, over Bonnes' objection, U.S. Magistrate Judge Stephen B. Jackson granted Scott's motion to amend her complaint, which Scott filed on April 1, 2015. Scott's second amended complaint added several paragraphs of factual allegations against Bonnes and Ganzer–Bovitz. Bonnes renewed his motion to dismiss on April 2, 2015, reasserting that Scott failed to state a claim upon which relief may be granted and that Scott failed to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9 for allegations of fraud. On May 1, 2015, Ganzer–Bovitz filed an answer denying the allegations in the second amended qui tam complaint.

## II. DISCUSSION

### A. Jurisdiction

This Court has federal question jurisdiction over Scott's claim against Bonnes, which arises under the FCA. *See* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

### B. Settlement Agreement

As an initial matter, Bonnes asserts that [a]lthough the Settlement Agreement *purports* to exempt Defendant Bonnes, it releases Community Care, Inc., "to-

gether with its current and former parent corporations; direct and indirect subsidiaries; related corporations; divisions; current or former owners; directors, affiliates, and officers, agents, servants, and employees....and the successors and assigns of any of them." *See* Settlement Agreement, Docket No. 29–2, filed 1/22/15, ¶ 26.

Bonnes' Orig. Mot. Dismiss ¶ 5, ECF No. 33, and Renewed Mot. Dismiss ¶ 44–2 (second alteration in original) (emphasis added). Next, citing language from this Court's February 4, 2015, Order, which found, inter alia, that the Settlement Agreement constituted a fair, adequate, and reasonable resolution of the matter and directed the parties to advise the Court when the terms of the agreement had been satisfied so that the Court could then dismiss the case, Bonnes informs the Court that after that Order was filed, Bonnes' attorney contacted Scott's attorney requesting that Scott immediately dismiss the action against Bonnes and that Scott's attorney allegedly advised that Scott had no intention of dropping the claim without receiving meaningful payment.[4]

Bonnes refers to various terms of the Settlement Agreement, language in the Court's February 4 Order, and communication between counsel following the entry of that February 4 Order. To the extent Bonnes' references are a challenge to Scott's ability to maintain her claim against Bonnes based on terms contained in the Settlement Agreement taken together with language in the Court's February 4 Order, Bonnes' argument fails.

 First, it is telling that in his recitation of the Settlement Agreement,

---

4. Bonnes quotes language from alleged communication between counsel on February 4, 2015, but has not substantiated this with a copy of the communication nor a verifying affidavit. Furthermore, it is unclear what bearing this alleged communication has on the legal issues currently before the Court.

Bonnes omits the exemption the parties carved out that allowed Scott to pursue her claims against Bonnes and Ganzer–Bovitz. The relevant and unaltered terms of the Settlement Agreement state,

> Relator, for herself and for her heirs, successors, attorneys, agents, and assigns, releases CCI, together with its current and former parent corporations; direct and indirect subsidiaries; related corporations; divisions; current or former owners; directors, affiliates, and officers, agents, servants, and employees, except Defendant William M. Bonnes and Defendant Angela Ganzer–Bovitz; and the successors and assigns of any of them, from any civil monetary claim the Relator has on behalf of the United States or the State for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729–3733.

Settlement Agt. ¶ 26, ECF No. 29–2. In paragraphs 24 and 25 of the Settlement Agreement, the United States and the State of Iowa, respectively, provide similar releases that likewise exempt Bonnes and Ganzer–Bovitz. *See id.* ¶¶ 24–25. The motion to accept the Settlement Agreement also details the intent of the parties to exclude claims against Bonnes and Ganzer–Bovitz: "The Settlement Agreement does not affect any individual claims Relator may have against the named individual Defendants, William Bonnes and Angela Ganzer–Bovitz, nor does it affect any defenses these Defendants may have to Relator's individual claims against them." Mot. Accept Settlement Agt. ¶ 6, ECF No. 29. Under federal common law, which governs the Settlement Agreement, *see id.* ¶ 26, ECF No. 29–2; *accord United States v. Basin Elec. Power Co-op.*, 248 F.3d 781, 796 (8th Cir.2001) ("Federal common law governs the interpretation and construction of a contract between the United States and another party." (citing *United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 606 (8th Cir.1999))), a

basic contract principle is that "specific terms and exact terms are given greater weight than general language," Restatement (Second) of Contracts § 203 (1981). Accordingly, the specific exemption of Bonnes and Ganzer–Bovitz from the release prevails over the general language releasing all current and former directors, agents, and employees. As Bonnes notes, the Court's February 4 Order found the terms of Settlement Agreement, which necessarily included paragraphs 24 through 26 that exempt Bonnes and Ganzer–Bovitz from release, to be fair, adequate, and reasonable. Nothing in the Settlement Agreement nor the Court's February 4 Order precludes Scott from maintaining her claims against Bonnes and Ganzer–Bovitz.

### C. Standard for a Rule 12(b)(6) Motion to Dismiss Claims under the FCA

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Benton v. Merrill Lynch & Co.*, 524 F.3d 866, 870 (8th Cir.2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Raynor*, 690 F.3d at 955 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

### D. The FCA and the Heightened Pleading Requirement under Rule 9(b)

 Scott's complaint alleges Bonnes violated the FCA and IFCA. "The FCA imposes liability on those who knowingly 'present false claims, or cause false claims to be presented, to the government for payment or approval; [knowingly] use false statements, or cause false statements to be used, to get a false claim paid or approved by the government; or conspire to defraud the government, among other things.' "[5] *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 916 (8th Cir.2014) (alteration in original) (quoting *Raynor*, 690 F.3d at 955 (citing 31 U.S.C. § 3729(a)(1))). "Under the FCA, private individuals are permitted 'to bring a civil action in the name of the United States against those who violate the [FCA]'s provisions.' Liability under the FCA attaches 'not to the underlying fraudulent activity, but to the claim for payment.' " *Id.* (alteration in original) (quoting *In re Baycol Prods. Litig.*, 732 F.3d 869, 874–75 (8th Cir.2013)).

> Because the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b). Under Rule 9(b), the circumstances constituting fraud...shall be stated with particularity. Rule 9(b)'s particularity requirement demands a higher degree of notice than that required for other claims, and is intended to enable the defendant to respond specifically and quickly to the potentially damaging allegations. To satisfy the particularity requirement of Rule 9(b), the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result. Put another way, the complaint must identify the who, what, where, when, and how of the alleged fraud.

*United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (alteration in original) (citation and internal quotation marks omitted).

Bonnes argues Scott's second amended complaint fails to meet the heightened pleading requirements of Rule 9(b). In his original motion to dismiss, Bonnes noted that the complaint only mentioned Bonnes by name six times. In his renewed motion, Bonnes asserts that the second amended complaint continues to fail to state a claim because it contravenes Rule 9(b). Bonnes also asserts that in granting Scott leave to amend her complaint, Judge Jackson ignored Bonnes' arguments in resistance and hopes this Court corrects that error by granting the motion to dismiss.

Bonnes' assertions regarding the propriety of Judge Jackson's ruling are both untimely and unfounded. Bonnes could have, but did not, appeal that ruling. *See* 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law.... Within fourteen days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court."); Fed.R.Civ.P.

---

**5.** "Because the FCA and the IFCA are nearly identical, case law interpreting the FCA also applies to the IFCA." *United States ex rel. Thayer v. Planned Parenthood of the Heartland,* 765 F.3d 914, 916 n. 1 (8th Cir.2014) (citing *Eilbert v. Pelican,* 162 F.3d 523, 526 (8th Cir.1998) ("When an Iowa statute is borrowed from similar federal legislation, the Iowa courts 'presume our legislature intended what Congress intended.' " (quoting *City of Davenport v. Pub. Emp't Relations Bd.,* 264 N.W.2d 307, 313 (Iowa 1978)))).

59(a) ("A district judge may refer to a magistrate judge for determination any matter that does not dispose of a charge or defense.... A party may serve and file objections to the order within 14 days after being served with a copy of a written order or after the oral order is stated on the record, or at some other time the court sets."); LR 72.1 (same). Furthermore, Bonnes' resistance to the motion to amend was premised on precisely the same arguments already advanced in his motion to dismiss. Judge Jackson appropriately deferred ruling on dispositive matters to this Court.

Bonnes' original motion challenged the sufficiency of the complaint noting that it identified Bonnes by name in only six places; however, Bonnes' renewed motion fails to specifically address the thirteen additional factual allegations raised against Bonnes in Scott's second amended complaint.[6] Bonnes defers to the brief filed in resistance to Scott's motion to amend and argues that while the second amended complaint does plead the how and who regarding the submission of allegedly fraudulent claims, it fails to provide the what, where, and when of the alleged fraud.

■ Of the sixty paragraphs of factual allegations in the second amended complaint, Bonnes is identified by name in nineteen. The allegations identify Bonnes by name and specify his conduct; the above lengthy factual background details those allegations. To summarize, Scott alleges that based upon personal knowledge as administrator of the Fairview RDF— one of CCI's three RCFs—Bonnes, as CEO and president of CCI, submitted bills to Medicaid for services that were not provided. The complaint details that the bills Bonnes submitted were based upon monthly reports sent from each of CCI's three RCFs to CCI's corporate office in DeWitt, that the reports were compiled based upon documentation detailing the level and type of care allegedly provided to CCI's Medicaid clients, and that CCI employees completed the documentation at the direction of Ganzer–Bovitz and Bonnes to inflate the level, type, and amount of care provided. The complaint provides specific examples of when and how directions were given regarding inflating documentation and asserts that Scott and others had voiced concern regarding this practice to both Ganzer–Bovitz and Bonnes. The complaint further outlines that the hours documented and billed for day habilitation services could not have been performed given the limited number of employees on each shift available to perform those services, the length of each employee's shift, and the number of clients allegedly receiving those services. In addition, the complaint provides examples of consequences suffered by employees, including Scott herself, for not following the billing inflation practices as directed by Ganzer–Bovitz and Bonnes. The complaint specifies that on February 16, 2012, CCI provided training on how to document day habilitation services, instructing staff on, inter alia, methods of inflating billable services. The complaint also provides that Bonnes submitted monthly billing to Medicaid based upon monthly reports Bonnes received from each of the RCFs.

Scott was the administrator of the Fairview RCF from December 12, 2011, until her termination on September 12, 2012, which is exactly nine months. As the com-

---

6. In reply to his original motion to dismiss, Bonnes acknowledged that Scott had filed a motion to amend her complaint and conceded that "if granted, may moot Defendant's pending Motion to Dismiss." Bonnes' Reply 2, ECF No. 33. Despite this concession, instead of withdrawing his motion to dismiss, in part or in whole, once the amended complaint was filed, Bonnes renewed his motion relying on his previously asserted arguments.

plaint alleges, Bonnes submitted the inflated bills to the Iowa Department of Human Services/Medicaid every month, which amounts to nine episodes during Scott's employment with CCI.

These allegations satisfy the pleading standard under both Rule 9(b) and *Joshi*. See *Thayer*, 765 F.3d at 917 (agreeing with the relator that "that neither Rule 9(b) itself nor *Joshi* requires that representative examples be pleaded in every FCA complaint that alleges a systematic practice or scheme of submitting false claims" and concluding "that *Joshi* 's representative-examples requirement need not be satisfied with respect to some portions of the complaint"). As the *Thayer* court reasoned,

> Applying [the *Joshi*] standard to the allegations in the complaint, we conclude that Thayer has pled sufficiently particularized facts to support her allegations that Planned Parenthood violated the FCA by filing claims for (1) unnecessary quantities of birth control pills, (2) birth control pills dispensed without examinations or without or prior to a physician's order, (3) abortion-related services, and (4) the full amount of services that had already been paid, in whole or in part, by "donations" Planned Parenthood coerced from patients. Thayer adequately alleges the particular details of these schemes, such as the names of the individuals that instructed her to carry out these schemes, the two-year time period in which these schemes took place, the clinics that participated in these schemes, and the methods by which these schemes were perpetrated. Moreover, she alleges that her position as center manager gave her access to Planned Parenthood's centralized billing system, pleads specific details about Planned Parenthood's billing systems and practices, and alleges that she had personal knowledge of Planned Parenthood's submission of false claims. Thay-

er's claims thus have sufficient indicia of reliability because she provided the underlying factual bases for her allegations. Accordingly, because Thayer pleaded the particular details of these schemes as well as the bases for her knowledge of these details, these allegations are sufficient to withstand Rule 9(b)'s particularity requirement.

*Id.* at 919 (internal citations omitted). Scott's second amended qui tam complaint provides as many details as, if not more than did, the relator's qui tam complaint in *Thayer*. See *id.*

Citing *Joshi*, Bonnes further asserts that Scott's allegations lack sufficient indicia of reliability because Scott was not a member of the billing department and did not have first-hand knowledge regarding the billing procedures. The holding in *Joshi* was not as sweeping as Bonnes suggests. In *Joshi*, the relator, an anesthesiologist, brought a qui tam action against the hospital where he practiced alleging the hospital billed Medicare for the service provided by a fellow physician at a higher rate than the rate to which the hospital was entitled for the service provided. *Joshi*, 441 F.3d at 554. The relator further alleged that the other physician failed to perform evaluations, failed to prescribe plans, and falsely certified having supervised nurse anesthetists. *Id.* In affirming the district court's finding the relator's claim did not meet the Rule 9(b) standard, the Eighth Circuit reasoned that the relator was an anesthesiologist who took no part in the hospital's billing procedures and made only vague allegation that "every" claim submitted by the hospital was fraudulent. *Id.* at 557. In the present case, unlike the anesthesiologist in *Joshi*, Scott had first-hand knowledge regarding the documentation directly related to CCI's billing practices. Scott's complaint details the process used to report inflated day habilitation service hours. Neither

the *Joshi* court nor the FCA requires that for an FCA complaint to satisfy Rule 9(b), the relator must be a member of the alleged violator's billing department. Just as the relator's qui tam complaint in *Thayer*, Scott's second amended qui tam complaint satisfies the Rule 9(b) standard as against Bonnes and states a claim under § 3729 that survives a Rule 12(b)(6) motion to dismiss. In finding Scott's complaint satisfies the heightened pleading requirement of Rule 9(b) and survives Bonnes' Rule 12(b)(6) motion to dismiss, the Court takes no position on the ultimate success of Scott's claim.

### E. FCA Retaliation Claim against Bonnes

██ Bonnes next argues that FCA retaliation claims can only be filed against employers, not individuals, and therefore Scott's retaliation claim against him fails as a matter of law. Scott resists arguing the 2009 amendments to § 3730(h) removed the requirement that conduct must have been committed by an employer and that Bonnes relies on pre-amendment authority in making his assertion. Citing *Mahony v. Universal Pediatric Services, Inc.*, 753 F.Supp.2d 839, 846 (S.D.Iowa 2010), Bonnes counters that limiting liability for retaliation to employers remains the law in this jurisdiction noting that in *Mahony*, this Court reviewed the 2009 amendments and held that an FCA claim can only be brought against an employer.

The version of § 3730(h) in effect prior to May 2009 provided the following:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment *by his or her employer* because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in

an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h)(1), Pub.L. 111-21, § 4(d), 123 Stat. 1624 (amended May 20, 2009) (emphasis added). Based upon that pre-2009 version of the § 3730(h)(1), the Eighth Circuit held that an FCA retaliation claim under § 3730(h)(1) "can only be against an 'employer,'" and therefore the relator's retaliation claim against the defendants in their individual capacities failed. *United States ex rel. Golden v. Ark. Game & Fish Comm'n*, 333 F.3d 867, 870 (8th Cir.2003) (citing *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 322 F.3d 738, 740 (D.C.Cir.2003); *Yesudian, ex rel. United States v. Howard Univ.*, 270 F.3d 969, 972 (D.C.Cir.2001)). The 2009 amendment to § 3730(h)(1), however, removed the language, "by his or her employer," from the text, which raised the question whether the amendment intended to provide individual liability.

Bonnes inaccurately asserts that in *Mahony* this Court found that the 2009 amendment did not allow for individual liability. *Mahony* was based upon conduct that occurred in 2008, *see Mahony*, 753 F.Supp.2d at 843, prior to the effective date of 2009 amendment, and therefore the pre-amendment version of the statute applied, *see* Pub.L. 111-21, § 4(f) (stating that "amendments made by this section shall take effect on [May 20, 2009,] the date of enactment of this Act and shall apply to conduct on or after the date of enactment"). Moreover, in *Mahony*, the plaintiff conceded that the retaliation claim could not be maintained against the individual defendants. *See Mahony*, 153 F.Supp.2d at 846 ("[Defendant] also argues, and Mahony concedes, that FCA actions will not lie against individual defendants. An FCA retaliation claim 'can only be against an employer'" (quoting *Golden*, 333 F.3d at 870)). Because the mainte-

nance of a retaliation claim against the individual defendants was not at issue in *Mahony,* ' the · ·Court's citation to the amended statute .cannot be read as the Court's "finding" regarding individual liability after the 2009 amendment to § 3730(h)(1).

In determining individual liability after the amendment, the legislative history behind the 2009 amendment to § 3730(h)(1) provides some helpful insight.

. The 1986 Amendments included Section 3730(h) which provides a cause of action for individuals who faced retaliation in response to bringing forth FCA claims of fraud against the Government. Congress included this provision in the 1986 Amendments because, as the Committee noted, it recognized "that few individuals will. expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment, or any other form of retaliation." While this provision was, designed to protect employees from employer retaliation, over the past 20 years courts have limited this protection through various decisions narrowly interpreting the definition of "employee" and thus leaving contractors and subcontractors open to retaliation."

For example, the Third and Fourth Circuits have held that an independent contractor is not protected under section 3730(h). To correct this loophole, section 5 clarifies section 3730(h) by simply including the terms "government contractor, or agent" in addition to the term "employee." The Committee believes that it is necessary to include these additional terms to assist individuals who are not technically employees within the typical employer-employee relationship, but nonetheless have a contractual or agent relationship with an employer. The Committee believes this is a vitally important clarification that respects the spirit and intent of the 1986 Amendments while offering whistleblower protections to contractors and agents who may come across fraud against the Government and report it under the FCA. S. Rep. 110–507, 26–27.

The Court finds persuasive the reasoning of several courts that have addressed the issue and found Congress' intention in amending § 3730(h) was to expand the number of plaintiffs, such as independent contractors and agents, who can bring an action under the FCA, but not to expand the number of defendants who can be held liable. *See Wichansky v. Zowine,* No. CV–13–01208–PHX–DGC, . 2014 WL 289924, at *4 (D.Ariz. Jan. 24, 2014) (discussing decisions by other courts that have addressed the issue and concluding "[t]he 2009 amendments were intended to broaden the scope of those protected from violations of the FCA, rather· than those who may be held liable for such violations"); *Lipka v. Advantage Health Grp., Inc.,* No. 13–CV–2223, 2013 WL 5304013, at *10–12 (D.Kan. Sept. 20, 2013) (distinguishing that the handful of post-amendment cases that have concluded the removal of the word "employer" gave rise to individual liability have not reviewed the legislative history of the amendment, whereas "[t]hose cases that have examined the legislative history have concluded that the 2009 Amendment was intended to correct what Congress viewed as the unduly narrow interpretation that the courts have given to the term 'employee' such that the statute was changed to prohibit retaliation against any employee, contractor or agent" and have "reject[ed] the argument that Congress, by removing the word 'employer,' intended to extend liability to non-employers," and thus agreeing "that the 2009 amendment to § 3730(h) was not intended to provide for individual liability and, that, consistent with the way in which the. vast majority of courts resolved the issue prior to the amendment, § 3730(h) does not contemplate individual liability for FCA whistle-

blower retaliation" (internal citation and quotation marks omitted)); *Russo v. Broncor, Inc.*, No. 13–CV–348–JPG–DGW, 2013 WL 7158040, at *6 (S.D.Ill. July 24, 2013) ("The Court finds that Congress did not intend to impose liability on individuals when it removed the phrase 'by his or her employer' in the 2009 amendment. Rather, as *Aryai [v. Forfeiture Support Associates, LLC*, 25 F.Supp.3d 376, 386 (S.D.N.Y. 2012) ], explains, the more likely reason for omitting 'employer' from the statute is to avoid confusion when an action is brought by a contractor or agent, the newly-added classes to be protected under the statute. Retaliation against these two classes would not be by an 'employer.' In light of numerous courts' rejection of individual liability in the pre–2009 cases, Congress could have used the words 'any person' to make its intent clear that the statute now imposed liability on individuals. The retention of the mandatory remedy of reinstatement further suggests Congress did not intend to add individual liability in the 2009 amendment."); *Elkharwily v. Mayo Holding Co.*, 955 F.Supp.2d 988, 995 (D.Minn.2013) (acknowledging the omission of the term "employer" in the 2009 amendment to § 3730(h) and concluding FCA retaliation claims cannot be maintained against individual defendants); *Howell v. Town of Ball*, No. CIV.A. 12–951, 2012 WL 3962387, at *3 (W.D.La. Sept. 4, 2012) ("The court has thoroughly reviewed the jurisprudence surrounding this issue and finds no support for plaintiff's conclusion that the omission of the phrase 'by his or her employer' resulted in the expansion of FCA retaliation claims to non-employer defendants. We also concur with defendants' observation that an alteration in the terms or conditions of employment, whether by demotion, termination or otherwise, may only be carried out by plaintiff's employer, which further supports the view that FCA retaliation claims may only be brought against a plaintiff's employer."); *Aryai*, 25 F.Supp.3d at 386 ("When considering amendments to legislation, courts must read the Act as a whole . . . [and cannot] ignore the common sense, precedent, and legislative history of the setting that gave it birth. Here, those interpretive aids rebut the presumption that Congress intended to expand liability by removing the word "employer" from section 3730(h)." (alterations in original) (quoting *FTC v. Jantzen, Inc.*, 386 U.S. 228, 234–35, 87 S.Ct. 998, 18 L.Ed.2d 11 (1967))). *But see Weihua Huang v. Rector & Visitors of Univ. of Va.*, 896 F.Supp.2d 524, 548 n. 16 (W.D.Va.2012) (noting "Congress amended [§ 3730(h)(1)] in 2009, eliminating language that referred to potential defendants as 'employers'" and that "by eliminating the reference to 'employers' as defendants in § 3730(h)(1), the 2009 amendment effectively left the universe of defendants undefined and wide-open," therefore, "[i]n the absence of specific guidance from the United States Court of Appeals for the Fourth Circuit dictating that there can be no individual liability in FCA retaliation claims after the 2009 amendment, . . . I will not dismiss those claims out of hand"); *United States ex rel. Moore v. Cmty. Health Servs., Inc.*, 3:09CV1127 (JBA), 2012 WL 1069474, at *9 (D.Conn. Mar. 29, 2012) (allegations regarding post-Amendment conduct give rise to FCA retaliation claim against individual defendants).

The Court concludes that the 2009 amendment to § 3730(h)(1) did not impose individual liability in FCA retaliation claims. Accordingly, Scott's retaliation claim against Bonnes fails as a matter of law.

## III. CONCLUSION

For the reasons stated, Bonnes' Motions to Dismiss, ECF Nos. 33 and 44, are **granted** in part and **denied** in part.

Bonnes' motion to dismiss Scott's liability claim under the FCA and the Iowa False Claims Act is **denied**, and Bonnes' motion to dismiss Scott's FCA retaliation claim against Bonnes is **granted**.

·IT IS SO ORDERED.