# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-1780

_____

Paul Allen Olson, Individually, and as Relator for the United States of America, and the State of Minnesota

*Plaintiff - Appellant*

v.

Fairview Health Services of Minnesota, and its wholly owned subsidiary or affiliate University of Minnesota Medical Center, Fairview, also known as Fairview University Medical Center

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 21, 2015
Filed: August 8, 2016

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Paul Allen Olson brought this qui tam[1] action under the Minnesota False Claims Act (MFCA), Minnesota Statutes Annotated § 15C.01 *et seq.*, and the federal False Claims Acts (FCA), 31 U.S.C. § 3729 *et seq.*, against the University of Minnesota Medical Center (UMMC), a wholly owned subsidiary of Fairview Health Services of Minnesota. Olson alleged that UMMC fraudulently induced the Minnesota Department of Human Services (MDHS) to overreimburse it for services provided to Medical Assistance (MA) patients. UMMC moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court[2] granted the motion and denied Olson leave to amend his complaint for a third time. Olson appeals both decisions. We affirm.

## I. *Background*

For 29 years, Olson worked for MDHS. He has held different positions, but his most recent position was Manager of Payment Policy and Rates Management, where he established payment rates for inpatient hospitals that provide services to MA patients.

In Minnesota, MA is jointly funded by the state and federal governments and administered by MDHS. MA payment rates are governed by Minnesota Statutes Annotated § 256.969. MA patient claims are submitted by the hospital providing service to MDHS electronically using a uniform claim form. The claim form includes patient information, services provided, and the "sticker price" charged by the hospital. "Sticker price" is the price an uninsured or non-MA patient would be charged. MDHS reimburses the hospital at a rate determined by the payment system of MDHS. The

---

[1]"*Qui tam* is short for '*qui tam pro domino rege quam pro se ipso in hac parte sequitur*,' which means 'who pursues this action on our Lord the King's behalf as well as his own.'" *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 463 n.2 (2007).

[2]The Honorable Michael J. Davis, United States District Judge for the District of Minnesota.

payment system applies various laws, rules, and MDHS price settings to each claim. The resulting reimbursement rate is applied to the sticker price, and the hospital receives the adjusted amount for providing services to an MA patient.

In July 2011, as part of an effort to decrease government expenditures, Minnesota amended § 256.969 ("the 2011 Amendment"). In his role at MDHS, Olson claims responsibility for drafting the language of the 2011 Amendment. The 2011 Amendment reduced MA reimbursements for hospital inpatient services by ten percent. However, the 2011 Amendment excluded "children's hospitals" from the reimbursement reduction.[3]

The term "children's hospital" is not defined by Minnesota statute, but, as Olson points out, the language mirrors the federal designation of children's hospital.[4] Minnesota law defines "[h]ospital" as "a facility defined in section 144.696, subdivision 3, and licensed under sections 144.50 to 144.58." Minn. Stat. Ann. § 256.9686, subd. 6. In turn, Minnesota Statutes Annotated § 144.696 defines

_____

[3]The 2011 Amendment provides, in relevant part:

(a) The total payment for fee for service admissions occurring on or after September 1, 2011, through June 30, 2015, made to hospitals for inpatient services before third-party liability and spend down, is reduced ten percent from the current statutory rates. Facilities defined under subdivision 16, long-term hospitals as determined under the Medicare program, children's hospitals whose inpatients are predominantly under 18 years of age, and payments under managed care are excluded from this paragraph.

Minn. Stat. § 256.969, subd. 3c(a) (July 21, 2011–June 30, 2013).

[4]The relevant federal regulation states: "(d) Children's hospitals. A children's hospital must . . . (2) [b]e engaged in furnishing services to inpatients who are predominantly individuals under the age of 18." 42 C.F.R. § 412.23(d).

"[h]ospital" as "any acute care institution licensed pursuant to sections 144.50 to 144.58." A Minnesota hospital obtains its license from the Minnesota Commissioner of Health. Minn. Stat. Ann. §§ 144.51, 144.55.

As drafter of the relevant language of the 2011 Amendment, Olson explains that MDHS has used the same legal definition of children's hospital, with the age-restriction language, since at least 1989. During the 1993 legislative session, MDHS used identical language to provide a nine-percent increase in MA funds to the three well-known children's hospitals,[5] while UMMC and other Minnesota hospitals were given a three-percent increase. Olson claims that the language was used again exclusively to exempt the three well-recognized Minnesota children's hospitals from the MA reimbursement reduction.

Fairview Health Services of Minnesota owns and operates hospitals throughout Minnesota, one of which is UMMC, formerly known as Fairview University Medical Center. The University of Minnesota Children's Hospital, previously Amplatz Children's Hospital, is the children's unit at UMMC. UMMC is a licensed hospital, but the children's unit itself is not. Once the 2011 Amendment went into effect, UMMC and its children's unit were subjected to the ten-percent rate reduction. UMMC believed that the exemption for "children's hospitals" could be interpreted to include its children's unit.

At some point in the fall of 2011, UMMC met with MDHS to discuss, among other things, the 2011 Amendment. The Assistant MDHS Commissioner at the time, Scott Leitz, and Director of Purchasing and Service Delivery, Mark Hudson, considered whether the children's unit at UMMC was exempt under the 2011

---

[5]The three hospitals and their MA admission rates are as follows: Minneapolis Children's Hospital, 65%; St. Paul Children's Hospital, 48%; and Gillette Children's Specialty Healthcare, 45%. UMMC's children's hospital has an MA admission rate of 27%.

Amendment. Either immediately before or after this meeting, Hudson asked Olson whether the children's unit was exempt. According to Olson, he explained to Hudson that under the relevant law and legislative history, the children's unit was not exempt. Olson recounts that Hudson approached him two more times about the same issue, once in January 2012 and again in August 2012. Olson claims that Hudson stated that he was making the inquiry on behalf of Leitz and James Golden, the MDHS Deputy Assistant Commissioner.

Olson responded to Hudson's August 2012 inquiry by email, explaining that because the children's unit at UMMC is a "hospital within a hospital" and does not have its own hospital license, it is not exempt under the 2011 Amendment. Olson then forwarded the email correspondence to the Deputy Medicaid Director and primary federal compliance attorney, who verbally warned Olson that "he should be careful" because Hudson, Leitz, and Golden are "not a management group that you said no to."

In October 2012, Scott Masson, an MDHS employee, informed Olson that Leitz and Golden had met with "Amplatz reps" and "decided that Fairview/Amplatz will be removed from the 10% inpatient rate reduction." Masson told Olson that Golden and Hudson had ordered Rachel Cell, an MDHS payment processing director, to implement the exemption. Masson was directed to execute the changes in the payment system, retroactive to September 1, 2011. Masson told Olson that Amplatz reps confirmed that all of the claims that the reimbursement would cover were for inpatients under 18 years of age that were admitted to UMMC's children's unit. Because the exemption was applied retroactively, UMMC received a reimbursement check of approximately $500,000. Olson claims to have witnessed verification of the reimbursement check on October 23, 2012. Olson also insists that only he, and not Leitz, Golden, or Hudson, had authorization to set MA rates for hospitals.

Later, in July 2013, Olson expressed his concern over the UMMC exemption to MDHS Commissioner Lucinda Jesson. Olson also met with MDHS Internal Audit Director Gary Johnson and MDHS Office of the Inspector General Chief Legal Counsel Bridgid Dowdal. Johnson and Dowdal investigated Olson's claims by conducting an audit, and on October 1, 2013, Jesson received the completed audit report.

Although the audit report found a "lack of clarity in the statutory definition of what constitutes a children's hospital," it concluded that it did not appear that the decision to give UMMC's children's unit the exemption under the 2011 Amendment "was consistent with the law or how other similarly situated children's facilities are treated." The report further found that the decision to exempt UMMC's children's unit "appear[ed] to be contrary to prior internal policy determinations of what constitutes a children's hospital." In the investigation, Golden and Leitz admitted that UMMC approaching MDHS was a "driving factor" in UMMC's children's unit getting the exemption. The report indicated that Leitz almost exclusively handled the exemption decision. Ultimately, the report recommended that MDHS obtain a formal legal opinion on whether UMMC's children's unit should have been exempted under the 2011 Amendment.

Per the report's recommendation, MDHS obtained a legal opinion. The opinion concluded that UMMC's children's unit likely should not have been excluded from the ten-percent rate reduction. Leitz sent a notice letter to UMMC explaining that MDHS was ending the exemption and would be issuing a notice of recovery once the overpayment was calculated. In May 2014, the Minnesota State Legislature amended § 256.969 to retroactively exempt all inpatients under 18 years of age at both UMMC and its children's unit from the ten-percent rate reduction.

Olson filed his initial qui tam complaint against UMMC under seal on September 23, 2013. The State of Minnesota and the United States both declined to

intervene. Since his initial filing, Olson has twice amended his complaint. His most recent complaint alleges that UMMC violated the MFCA and FCA by falsely claiming that UMMC's children's unit was a "children's hospital" under the 2011 Amendment.

The district court dismissed Olson's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). The court held that because the precise definition of "children's hospital" is unclear, UMMC's lobbying efforts to exempt its children's unit from the ten-percent MA rate reduction could not be characterized as a false claim under the MFCA or FCA. For similar reasons, the district court held that UMMC's individual claims for MA reimbursement did not give rise to liability under either the MFCA or FCA.

## II. *Discussion*

The FCA has its genesis in the Civil War era. S. Rep. No. 99-345, at 8 (1986). President Lincoln signed the bill into law to rein in the "rampant fraud" of Civil War defense contractors. *Id.* Today, fraud remains a significant concern of the United States government. In 1986, Congress passed the False Claims Reform Act with the stated purpose of "enhanc[ing] the Government's ability to recover losses sustained as a result of fraud against the Government." *Id.* at 1. Congress noted that "the recent proliferation of cases among some of the largest Government contractors . . . necessitates modernization of the Government's primary litigative tool for combatting fraud; the False Claims Act (31 U.S.C. 3729, 3730)." *Id.* at 2. The False Claims Reform Act financially incentivized enforcement by private individuals in hopes that a coordinated effort between government and citizen would stem the defrauding of public funds. *Id.*

Olson alleges that UMMC violated the FCA by (1) knowingly presenting or causing to be presented false or fraudulent claims for payment or approval; (2) knowingly making, using, or causing to be made or used, false records or statements

material to false or fraudulent claims; (3) knowingly making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money or property to the government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the government; (4) and conspiring to commit a violation of the FCA. *See* 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G). Olson reiterates these claims under the MFCA.[6]

We review de novo a district court's dismissal of an action pursuant to the heightened pleading standard applied to complaints of fraud under Federal Rule of Civil Procedure 9(b). *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011). In order to satisfy the pleading requirements of Rule 9(b), "the complaint must plead such facts as the time, place, and content of the defendant's false representations, as well as the details of the defendant's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result." *U.S. ex rel. Joshi*

---

[6]Because the MFCA mirrors the FCA, we will analyze all of Olson's claims under the FCA. *Compare* 31 U.S.C. 3729(a) (imposing liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government"; "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)"), *with* Minn. Stat. Ann. § 15C.02(a) (imposing liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; "knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; "knowingly makes or uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a political subdivision, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state or a political subdivision"; "knowingly conspires to commit a violation of clause (1), (2), (4), (5), (6), or (7)").

*v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (citations omitted). In other words, "the complaint must identify the who, what, where, when, and how of the alleged fraud." *Id.* (quotation and citation omitted).

## A. *31 U.S.C. § 3729(a)(1)(A)*

Olson alleges that UMMC violated § 3729(a)(l)(A) by "knowingly present[ing], or caus[ing] to be presented, false or fraudulent claims for payment or approval of Medicaid monies, knowing that [it] did not legally qualify for the exemption from the ten percent reduction in Medicaid payments under Minnesota Statute 256.969, Subd. 3c." Olson disagrees with the district court that UMMC did not understand the language of the 2011 Amendment clearly to include its children's unit in the ten-percent reduction in Medicaid payments. Olson contends that the 2011 Amendment, and specifically the definition of "children's hospital," is not ambiguous. For support, Olson points us to the definition of "children's hospital" and "the historical and contextual understanding of true children's hospitals in Minnesota."

A prima facie case under § 3729(a)(l)(A) requires that "(1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent." *United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 803 (8th Cir. 2001). "The FCA attaches liability, not to the underlying fraudulent activity, but to the claim for payment." *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998) (quotations and citations omitted). "[T]he falsehood in the claim must be material to the payment decision." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 886 (8th Cir. 2003). "Without sufficient allegations of materially false claims, an FCA complaint fails to state a claim on which relief may be granted." *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 796 (8th Cir. 2011) (citations omitted). In order to state a claim that is "plausible," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), Olson's complaint "must contain facts with enough specificity 'to raise a right to relief above the speculative

level.'" *See U.S. ex rel. Raynor v. Nat'l Rural Utils. Coop. Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Olson alleges that UMMC's false or fraudulent claim is that it's children's unit was a "children's hospital." In order for Olson to prevail, he "must show that there is no reasonable interpretation of the law that would make the allegedly false statement true." *See U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1191 (8th Cir. 2010). Put differently, UMMC is not liable if its children's unit could reasonably be interpreted as a "children's hospital." It is undisputed that Minnesota law does not define the term "children's hospital." Olson directs us to the definition of "hospital,"[7] arguing that what is true of a "hospital" is at least true of a "children's hospital." We are not persuaded.

Olson's argument assumes that "children's hospital" is derived simply by combining the definition of "children" and "hospital." Yet, there is good reason to consider "hospital" and "children's hospital" meaningfully distinct terms. First, as Olson has noted, the language from the 2011 Amendment mirrors the federal designation of "children's hospital." *See* 42 C.F.R. § 412.23(d). Both define a children's hospital in relation to the age of its inpatients—inpatients must be predominantly under 18 years of age. The federal designation does not require a children's hospital to have a distinct license, as Olson contends that the 2011

---

[7]In the definition section of the relevant statute,

> "[h]ospital" means a facility defined in section 144.696, subdivision 3, and licensed under sections 144.50 to 144.58, an out-of-state facility licensed to provide acute care under the requirements of that state in which it is located, or an Indian health service facility designated to provide acute care by the federal government

Minn. Stat. Ann. § 256.9686, subd. 6 (2015).

Amendment requires in order for the exemption to apply. Were UMMC to look to and rely on the federal designation of "children's hospital," UMMC would actually find support for the contention that its children's unit was a "children's hospital." This leads to a second point. Even if Olson is correct that the 2011 Amendment required a hospital license, it is not apparent from the face of the statute that a separate license would be required for subunits within properly licensed hospitals. UMMC is a licensed hospital, and the language of the 2011 Amendment does not clearly indicate that each of its subunits must have its own distinct license to qualify for the exemption. Third, Olson's reading would render "children" redundant. The 2011 Amendment exempts "children's hospitals whose inpatients are predominantly under 18 years of age." Minn. Stat. Ann. § 256.969, subd. 3c(a) (July 21, 2011–June 30, 2013). If Olson's interpretation were adopted, there is no reason that Minnesota could not have accomplished the same result by exempting "hospitals whose inpatients are predominantly under 18 years of age." And although there is no categorical rule against treating a term as redundant, terms should be construed to avoid leaving them with "no operation at all." *See Marbury v. Madison*, 5 U.S. 137, 174 (1803). We agree with the district court that the language of the 2011 Amendment is ambiguous.

In urging us to find the 2011 Amendment unambiguous, Olson relies heavily on his role in drafting the language of the 2011 Amendment as well as the historical and contextual understanding of children's hospitals in Minnesota—i.e., legislative history. But this reliance cripples his argument. Legislative history is properly consulted only in light of a textual ambiguity. *See Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1709 (2012) (reminding the parties that "'reliance on legislative history is unnecessary in light of the statute's unambiguous language'" (quoting *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 236 n.3 (2010))); *Dep't of Hous. & Urban Dev. v. Rucker*, 535 U.S. 125, 132 (2002) (acknowledging that the lower court "correctly recognized that reference to legislative history is inappropriate when the text of the statute is unambiguous"); *Tenn. Valley Auth. v. Hill*, 437 U.S.

153, 184 n.29 (1978) (holding that "[w]hen confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning"); *FDIC v. Gunderson*, 106 F.2d 633, 635 (8th Cir. 1939) (explaining that where "statute is clear and unambiguous," it is unwarranted to refer to "legislative history or construction" (citation omitted)). If determining the true meaning of "children's hospital" requires reference to Olson's intent as drafter, the historical legislative backdrop of that term, and Minnesota contextual considerations, then the language is not unambiguous. Thus, Olson's legislative-history argument actually favors a finding that UMMC did not act fraudulently.

In the absence of a statutory definition of "children's hospital," it was reasonable for UMMC to inquire about the proper classification of its children's unit. A reasonable interpretation of ambiguous statutory language does not give rise to a FCA claim.

## B. *31 U.S.C. § 3729(a)(1)(B)*

Olson also alleges that UMMC violated § 3729(a)(1)(B) by "knowingly ma[king], us[ing], or caus[ing] to be made or used, false records or statements material to a false or fraudulent Claim when [it] submitted billings to [MDHS] for [MA] monies in excess of those [it] w[as] legally entitled to receive." The district court held that Olson did not allege with sufficient particularity that UMMC violated § 3729(a)(1)(B). Olson contends that the district court erroneously required him to prove UMMC's knowledge under Rule 9(b)'s particularity requirement.

The district court did not incorrectly hold Olson to Rule 9(b)'s heightened pleading standard. The court based its holding on its determination that the 2011 Amendment did not unambiguously exclude UMMC's children's unit from the exemption. As the court explained, Olson's second amended complaint merely "illustrate[d] that [UMMC] approached [M]DHS with a reasonable interpretation of

unclear Minnesota statutes. This conduct cannot sustain a violation of section 3729(a)(l)(B)." The district court did not require Olson to plead UMMC's "knowledge" with particularity; rather, because of its conclusion under § 3729(a)(1)(A), the court held that Olson failed to prove the "who, what, where, when, and how of the alleged fraud." *See Joshi*, 441 F.3d at 556 (quotation and citation omitted). Both in briefing and at oral argument, Olson has characterized the fraud as UMMC officials claiming that UMMC's children's unit was a "children's hospital." Because that claim was a reasonable interpretation of the statute, and because Olson has not provided any other evidence of fraudulent conduct, Olson's claim under § 3729(a)(1)(B) does not meet Rule 9(b)'s requirements.

### C. *31 U.S.C. § 3729(a)(1)(G)*

Next, Olson alleges that UMMC violated § 3729(a)(1)(G) by "knowingly conceal[ing] an obligation to pay back [MA] monies to the federal and state government, that it knew it illegally received." The dissent has its "doubts" that Olson's complaint alleges a violation under subsection (a)(1)(G) but would, nonetheless, allow Olson's claim to go forward. The dissent makes this modest-seeming proposal because UMMC did not brief the issue to the dissent's satisfaction. Similarly, the dissent charges us with "reach[ing] out" by applying Rule 9(b)'s heightened pleading requirements to Olson's allegation under this subsection.

Section 3729(a)(1)(G), the so-called reverse false-claims provision of the FCA,[8] provides for recovery from someone who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." Olson must demonstrate that UMMC owed an "obligation," defined as "an established duty, whether or not fixed, arising from an

---

[8]We have not had the opportunity to analyze § 3729(a)(1)(G). Congress revised § 3729 through enactment of the Fraud Enforcement and Recovery Act of 2009 (FERA). Section 3729(a)(7) was amended to become § 3729(a)(1)(G).

express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).[9]

We first address the dissent's contention that we need "not reach out to decide" whether Olson must meet Rule 9(b)'s heightened pleading requirements in showing that UMMC "knowingly conceal[ed] . . . an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Notably, Olson himself does not contest the district court's application of Rule 9(b) to his claim under § 3729(a)(1)(G).[10] Under well-established circuit precedent, we generally consider an issue not raised or briefed waived. *See Bechtold v. City of Rosemount*, 104 F.3d 1062, 1068 (8th Cir. 1997). Moreover, the dissent's contention is curious. Rule 9(b) is a rule of procedure that applies regardless of whether, as the dissent says, the issue has "been raised or addressed by either party." We have a duty to apply the law as it exists, and Rule 9(b)'s pleading standard is not an affirmative defense that is waived by a defendant's failure to raise it. Importantly, many of the purposes of Rule 9(b) would be thwarted if Olson's claim were allowed to proceed. *See* 5A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure §

---

[9]This definition was added to the FCA by FERA. The Senate Report of FERA explains that the definition addresses confusion among the courts as to what constitutes an obligation. *See* S. Rep. No. 111-10, at 441 (2009). The adopted definition tracks closely with what had been the definition adopted by our circuit. *See United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997) (defining "obligation" as "a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgment of indebtedness" and not "merely a potential liability").

[10]As already noted, Olson argues that the district court erroneously required him to plead knowledge particularly, but he does not argue that Rule 9(b)'s heightened pleading standard does not apply to § 3729(a)(1)(G). In fact, in his reply brief, Olson argues at length that Rule 9(b) does apply and has been satisfied.

1296 (3d ed. 2004) (listing purposes of Rule 9(b) as safeguarding reputation of defendants, disposing early of unfounded fraud claims advanced only for their nuisance value, and preventing fishing expeditions).

Subsection (a)(1)(G) is one of seven substantive provisions imposing liability for fraud against the government. The dissent describes our position as "doubtful at best" because subsection (a)(1)(G) "does not by its terms require falsity or deception." When reformed in 1986, the stated purpose of the FCA "[wa]s to enhance the Government's ability to recover losses sustained as a result of *fraud* against the Government." S. Rep. No. 99-345, at 1 (emphasis added).[11] Additionally, the Supreme Court has recently reiterated that the FCA "is not 'an all-purpose antifraud statute.'" *Universal Health Servs.*, 2016 WL 3317565, at *12 (quoting *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672 (2008)). If the FCA is not meant to cover all types of fraud, it would be unreasonable to assume it covers both fraudulent and

_____

[11]The dissent takes issue with our reference to the stated purpose of the False Claims Reform Act, saying that it "carries no weight at all here" and "is a flimsy foundation for such a bold claim." A few observations are in order: (1) FERA merely amended the False Claims Reform Act—it did not purport to write on a clean slate; (2) the title of the bill that amended (a)(1)(G)'s language is the *Fraud* Enforcement and Recovery Act; (3) FERA's own history, which the dissent does find relevant, unequivocally states that its purpose is to "increase accountability for the corporate and mortgage *frauds*," "provide[] important clarifications to current criminal and civil *fraud* statutes to ensure that law enforcement has the tools it needs to prevent and punish these *frauds*, as well as to recover taxpayer money lost to these *frauds*," and "correct[] and clarif[y]" the FCA "to protect from *fraud* the Federal assistance and relief funds expended in response to our current economic crisis"; S. Rep. No. 111-10, at 430–31, 433 (2009); and (4) bold or not, the "foundation" for our claim is much more than the stated purpose of the False Claims Reform Act—the dissent's choice not to address our analysis of (a)(1)(G)'s language does not make it disappear.

nonfraudulent conduct.[12] More fundamentally, the absence of terms such as "false" or "fraudulent" is not dispositive of the nature of the conduct prohibited. The portion of subsection (a)(1)(G) at issue prohibits persons from knowingly concealing an obligation to pay money to the government. To conceal is to fail to disclose. The Restatement (Second) of Contracts § 160 treats concealment as equivalent to a misrepresentation. Restatement (Second) of Contracts § 160 (Am. Law Inst. 1981) ("Action intended or known to be likely to prevent another from learning a fact is equivalent to an assertion that the fact does not exist."). Likewise, at common law, fraud encompassed material nondisclosures by those with a duty to disclose. *See Chiarella v. United States*, 445 U.S. 222, 229 (1980); *see also Neder v. United States*, 527 U.S. 1, 3 (1999) (explaining that "the well-settled, common-law meaning of 'fraud' required a misrepresentation or *concealment* of *material* fact" (first emphasis added)). It is evident that the language at issue here encompasses fraudulent conduct to which Rule 9(b)'s pleading requirements apply. Our understanding comports with the punitive nature of liability that the FCA imposes. Without fraud, punitive damages—a mandatory penalty of up to $10,000 for each claim and treble damages—would seem an unreasonable levy against individuals guilty only of "knowingly" receiving an overpayment from the government fisc.

Ultimately, MDHS determined that UMMC's children's unit did not qualify as a children's hospital under the 2011 Amendment, and MDHS issued UMMC a notice of recovery. Up to that point, as we have already explained, UMMC had not engaged

---

[12]The dissent is correct that this statement, read on its own, is a *non sequitur*. Of course, most statements are properly understood in context. The Supreme Court's reminder that the FCA is not an all-purpose antifraud statute was made in the context of the Court rejecting attempts to expand the FCA beyond its limited scope of "protect[ing] the Government from loss due to *fraud*." *See Allison Engine Co.*, 553 U.S. at 672. Placed in this context, we are confident the statement is not "a complete *non sequitur*."

-16-

in any fraudulent activity. If there is no allegation of fraudulent conduct under the FCA, then there can be no reverse liability under § 3729(a)(1)(G). And though Olson need only plead UMMC's knowledge generally, it would be remarkable if relators could escape Rule 9(b)'s heightened pleading requirements for fraud by seeking recovery through subsection (a)(1)(G). Olson has not pleaded "the who, what, when, where, and how" of UMMC's concealment of its obligation to return the reimbursement. *See Summerhill*, 637 F.3d at 880. Moreover, Olson has not demonstrated that UMMC knew that it had an "obligation" to pay back the $500,000 payment that it received. At the time that MDHS issued UMMC a reimbursement, UMMC did not have an obligation to remit the reimbursement back to the government; at most, UMMC merely had a potential liability and not an established duty. Olson's second amended complaint fails to demonstrate that UMMC violated § 3729(a)(1)(G).

### D. *31 U.S.C. § 3729(a)(1)(C)*

Finally, Olson alleges that UMMC violated § 3729(a)(1)(C) by "illegally conspir[ing] with [M]DHS employees, including at least Mark Hudson, Scott Leitz and James Golden, to obtain illegal amounts of [MA] monies, in violation of [31 U.S.C. § 3729(a)(1)] subparagraphs (A), (B) and (G)." Because we find no violation of subparagraphs (A), (B), and (G), as a matter of law, UMMC has not violated subparagraph (C).

### E. *Motion to Amend*

Before the district court, Olson moved to amend his complaint for a third time. Olson sought to clarify evidence of false statements that UMMC representatives made to MDHS, including the specific false statement that UMMC's children's unit was a "true" children's hospital. Olson also sought to introduce MDHS form DHS-4138 (Provider Agreement), purportedly demonstrating that UMMC agreed to abide by

federal and state statutes before receiving any MA funds from the government. The district court denied Olson's motion to amend as futile.

Normally, we review the denial of leave to amend for an abuse of discretion and a determination of futility de novo. *Joshi*, 441 F.3d at 555. However, in his opening brief, Olson failed to develop his argument regarding the issue as required by Federal Rule of Appellate Procedure 28(a)(8)(A). As such, he has waived the argument on appeal. Nonetheless, "[e]ven if we were to exercise our discretion to overlook the waiver," *see United States v. Williams*, 627 F.3d 324, 329 (8th Cir. 2010) (citation omitted), the district court correctly determined Olson's proposed amendments to be futile. Olson's amendments do nothing to address the crux of the case—the reasonableness of UMMC's interpretation of the 2011 Amendment. Olson will not be granted leave to amend his complaint for a third time.

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

RILEY, Chief Judge, concurring in the judgment in part and dissenting in part.

In 2011, Minnesota reduced the rates at which most hospitals were reimbursed for inpatient services covered by Medicaid, but it left the existing rates in effect for "children's hospitals whose inpatients are predominantly under 18 years of age." See Act of July 20, 2011, art. 6, § 21, 2011 Minn. Laws 1154, 1235 (codified as amended at Minn. Stat. § 256.969, subdiv. 3c(a)). Fairview Health Services of Minnesota (Fairview) arranged for certain services performed at the University of Minnesota Medical Center, Fairview (UMMC) to be reimbursed at the higher, children's-hospital rates. Paul Olson says Fairview knew it did not qualify for the exception and was not entitled to the full amount of reimbursements it received, and Fairview should have returned the overpayments, but did not. If so, Fairview might have

violated a provision of the Federal False Claims Act that targets "knowingly conceal[ing] . . . an obligation to pay or transmit money . . . to the Government,"[13] 31 U.S.C. § 3729(a)(1)(G), and an almost identical provision under Minnesota law, see Minn. Stat. § 15C.02(a)(7).[14]  I therefore would let Olson go forward with his claims based on those provisions.

The majority holds otherwise because it concludes Fairview did not act "knowingly," as required by the statute.  Ante at 9-13, 16-17.  See 31 U.S.C. § 3729(a)(1)(G); Minn. Stat. § 15C.02(a)(7); see also 31 U.S.C. § 3729(b)(1)(A) (defining knowledge as actual knowledge, deliberate ignorance, or reckless disregard for the truth); Minn. Stat. § 15C.01, subdiv. 3 (same).  I agree with the premise that "[a]n FCA defendant does not act 'with the knowledge that the FCA requires before liability can attach' when 'the defendant's interpretation of the applicable law is a reasonable interpretation,'" United States ex rel. Ketroser v. Mayo Found., 729 F.3d

---

[13]As the majority notes, ante at 14 n.9, parts of the statutory definition of an "obligation" resemble the interpretation this court adopted back when the term was undefined.  Compare 31 U.S.C. § 3729(b)(3), with United States v. Q Int'l Courier, Inc., 131 F.3d 770, 773 (8th Cir. 1997).  Indeed, in its summary of the bill that added the definition, the Senate Judiciary Committee singled out our reading as representing the narrow end of the "spectrum" of obligations the new provision was meant to reach, with the other extreme being "the instance where there is a relationship between the Government and a person that results in a duty to pay the Government money, whether or not the amount owed is yet fixed."  S. Rep. No. 111-10, at 14 & n.13 (internal quotation marks omitted).  As reflected in that explanation, the key points where the statute differs from our old formulation include its clarification that an obligation need not be "fixed," as well as its explicit inclusion of obligations "arising . . . from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).

[14]Absent any indication the parallel language means different things in the two statutes, I agree with the majority's approach of addressing Olson's claims together and following federal case law.  Ante at 8 n.6.  For simplicity's sake, I therefore phrase the rest of my analysis in terms of the False Claims Act.

825, 832 (8th Cir. 2013) (quoting United States ex rel. Hixson v. Health Mgmt. Sys., Inc., 613 F.3d 1186, 1190 (8th Cir. 2010)), at least absent other evidence of knowledge, cf. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp., 276 F.3d 1032, 1053 (8th Cir. 2002). I also agree the phrase "children's hospitals whose inpatients are predominantly under 18 years of age," Minn. Stat. § 256.969, subdiv. 3c(a), is unclear. The crucial question, then, is whether Fairview resolved the ambiguity reasonably.

The majority gives that question short shrift, answering as if Fairview's interpretation was just that the children's-hospital unit at UMMC qualified for the exception to the reimbursement rate cut. Ante at 10, 12-13. If that were true, I would probably agree Fairview's interpretation was reasonable. But Fairview actually obtained an exemption from the reduced rates for all inpatients younger than eighteen at UMMC, whether admitted to (or treated in) the children's unit or elsewhere in the hospital.[15] Because not all children at UMMC go to the children's-hospital unit, according to Olson, that means Fairview was reimbursed at the higher children's-hospital rates for services provided by other UMMC units. Olson says some of those services, like birth services for newborns, maternity services for mothers younger than eighteen, and appendectomies for children, normally would not be provided at a children's hospital at all.[16] Fairview's purported entitlement to the reimbursements

---

[15]Similarly, when the Minnesota legislature later retroactively changed the law to exempt Fairview unambiguously—after the Minnesota Department of Human Services (department) (prompted by Olson) conducted an audit, decided the exception as written did not cover Fairview, and asked for its money back—the amended statute carved out all "admissions of children under 18 years of age" at UMMC, not just admissions to the children's-hospital unit. See Act of May 20, 2014, art. 24, § 13, 2014 Minn. Laws 2085, 2348 (codified at Minn. Stat. § 256.969, subdiv. 3c(d)).

[16]The majority emphasizes that, according to a secondhand account Olson received from a colleague, Fairview told the department that the exemption would

thus required reading "children's hospitals whose inpatients are predominantly under 18 years of age" to mean "generalist hospitals whose inpatients are predominantly adults, to the extent they also treat children." Because that interpretation is patently unreasonable, however ambiguous the statute, Fairview must have known it was getting overpaid. So the requirement of "knowing" conduct is no reason to dismiss Olson's § 3729(a)(1)(G) claims.

Fairview identifies no others. Its entire argument on appeal is directed at subsections (a)(1)(A) and (B)—indeed, subsection (a)(1)(G) is not mentioned once—and Fairview centers on the idea that Olson's allegations failed to establish Fairview knowingly made false claims for government money. Unlike those provisions, subsection (a)(1)(G) by its terms does not require the existence of any false claims, only the "conceal[ing]," "avoid[ing]," or "decreas[ing]" of "an obligation" to the government, accord Minn. Stat. § 15C.02(a)(7), so it is beyond the reach of Fairview's challenge. I see no reason to search for other, unbriefed theories to justify throwing out Olson's whole case at this early stage.

In particular, unlike the majority, I would not reach out to decide subsection (a)(1)(G) requires some sort of "fraudulent conduct" that necessarily implicates the requirement that fraud be pled with particularity. Ante at 16-17. See Fed. R. Civ. P. 9(b). Not only has that issue not been raised or addressed by either party, but the majority's position is doubtful at best. True, this court has generalized that

_____

only affect reimbursements for services provided to children admitted to UMMC's children's-hospital unit. Ante at 5. As far as Olson's subsection (a)(1)(G) claims are concerned, that makes no difference. However Fairview's lobbyists initially sold the exemption to the department, Olson's claims are about the reimbursements Fairview actually received after the exemption was implemented, and according to Olson's allegations—which, for now, we must take as true, see, e.g., Hixson, 613 F.3d at 1188—the lobbyists' assurances were wrong.

"[b]ecause the FCA is an anti-fraud statute, complaints alleging violations of the FCA must comply with Rule 9(b)." United States ex rel. Joshi v. St. Luke's Hosp., Inc., 441 F.3d 552, 556 (8th Cir. 2006). But such statements come in decisions dealing with False Claims Act provisions involving conduct that clearly looks like fraud. See, e.g., id. at 554, 556 (addressing allegations a hospital and doctor billed the government for medicine and supplies not actually given to patients and lied about nurse anesthetists' work being directed or supervised by a doctor); United States ex rel. Kinney v. Stoltz, 327 F.3d 671, 672-74 (8th Cir. 2003) (involving false certifications that ambulance runs were medically necessary); see also 31 U.S.C. § 3729(a)(1)(A)-(B) (targeting "false or fraudulent claim[s]" and "false record[s] or statement[s]"). When an alleged False Claims Act violation does not depend on fraud, on the other hand, there is nothing to trigger Rule 9(b). See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 238 n.23 (1st Cir. 2004) ("A retaliation claim under 31 U.S.C. § 3730(h) does not require a showing of fraud and therefore need not meet the heightened pleading requirements of Rule 9(b).").

Even though subsection (a)(1)(G) does not by its terms require falsity or deception, the majority insists it cannot be violated absent "fraudulent conduct" because the False Claims Act is an "antifraud statute" and subsection (a)(1)(G) appears alongside its other substantive prohibitions.[17] Ante at 15-16. I do not doubt the act is primarily concerned with fraud, but that does not mean Congress could not use the same law to prohibit other, closely related misconduct (or anything else

---

[17]Contrary to the majority's premise, the other provisions of § 3729(a)(1) are not all obviously confined to "fraud against the government," at least in the sense of requiring anything misleading or deceptive. Subsection (a)(1)(D), for example, forbids having control over government property and failing to deliver all of it, while subsection (a)(1)(F) targets people who buy public property or accept it as collateral from someone in the government or the military who cannot legally sell or pledge it. Accord Minn. Stat. § 15C.02(a)(4), (6).

Congress chose to include) as well. The legislative history the majority invokes to suggest the False Claims Act reaches nothing but fraud—general references to "fraud" in prefatory statements by the Senate Judiciary Committee about the purpose of bills amending various parts of the False Claims Act, see S. Rep. No. 111-10, at 1-2, 4; S. Rep. No. 99-345, at 1—is a flimsy foundation for such a bold claim. Ante at 15 & n.11. In fact, some of that history carries no weight at all here, because it addressed a version of the act in which the precursor to subsection (a)(1)(G) actually did require "mak[ing], us[ing], or caus[ing] to be made or used, *a false record or statement.*" See 31 U.S.C. § 3729(a)(7) (2006) (emphasis added); S. Rep. No. 99-345, at 18-19, 39. The root of my disagreement with the majority, of course, is that the law has since changed and the current statute no longer contains such a requirement when it comes to liability based on "conceal[ing]" or "improperly avoid[ing] or decreas[ing]" obligations to the government.[18] 31 U.S.C. § 3729(a)(1)(G) (2012); accord Minn. Stat. § 15C.02(a)(7).

The majority also cites the Supreme Court's recent reminder that "[t]he False Claims Act is not 'an all-purpose antifraud statute,'" Universal Health Servs., Inc. v. United States ex rel. Escobar, ___ U.S. ___, ___, 136 S. Ct. 1989, 2003 (2016) (quoting Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 672 (2008)), declaring that "[i]f the FCA is not meant to cover all types of fraud, it would

---

[18]What is more, in the report on the bill that effected that change, the section that was specifically about the False Claims Act described it as "an extraordinary civil enforcement tool used to recover funds lost to fraud and abuse," not just fraud. S. Rep. No. 111-10, at 10. And when that report got even more specific about the proposed changes to subsection (a)(1)(G), it opined that the amended provision would reach "any knowing and improper retention of an overpayment beyond or following the final submission of payment as required by statute or regulation," which does not sound like it requires fraud. Id. at 15 ("[T]he violation of the FCA for receiving an overpayment may occur once an overpayment is knowingly and improperly retained, without notice to the Government about the overpayment.").

be unreasonable to assume it covers both fraudulent and nonfraudulent conduct." Ante at 15-16. Although the premise is undeniable, see 31 U.S.C. § 3729(a)(1) (listing specific prohibited acts), the majority's conclusion is a complete non sequitur. There is nothing unusual, much less irrational, about a law that prohibits some, but not all, fraud and also reaches some other misconduct. The U.S. Code is replete with such statutes, some of which we deal with routinely. See, e.g., 8 U.S.C. § 1325 (prohibiting lying or concealing facts to gain entry to the United States and fraudulently getting married or starting a business to evade the immigration laws, as well as entering the United States at an improper time or place or without examination and inspection); 18 U.S.C. §§ 1961-62 (targeting "racketeering activity," which includes mail and wire fraud, among other listed varieties, as well as dozens of other offenses).

The majority's protests notwithstanding, all of this is not to say "the language at issue here" does not "encompass[] fraudulent conduct." Ante at 16. Of course it does. The point is that it might also encompass other things[19]—the fact that *some* concealment is fraudulent does not imply it *all* is—so pleading a violation of subsection (a)(1)(G) does not necessarily involve "alleging fraud or mistake," which is what must be done with particularity. See Fed. R. Civ. P. 9(b). As to whether the nonfraudulent things Olson says Fairview did rise to the level of "conceal[ing]" an obligation, cf. In re NationsMart Corp. Sec. Litig., 130 F.3d 309, 315 (8th Cir. 1997)

---

[19]Even so, the majority need not worry that subsection (a)(1)(G), if not limited to fraud, would threaten "an unreasonable levy against individuals guilty only of 'knowingly' receiving an overpayment from the government fisc," ante at 16; see also 31 U.S.C. § 3729(a)(1) (prescribing steep penalties for False Claims Act violations), for the simple reason that the provision does not actually punish people for just passively receiving extra money from the government. Rather, liability plainly requires doing something culpable in order to get away with keeping an overpayment, namely "conceal[ing]" or "improperly avoid[ing] or decreas[ing]" a duty to give it back. Id.; accord Minn. Stat. § 15C.02(a)(7).

("The only consequence of a holding that Rule 9(b) is violated with respect to a [nonfraud] claim would be that any allegations of fraud would be stripped from the claim. The [other] allegations . . . , which are at the heart of [the] claim, would survive."), I have my doubts. But Fairview does not raise the issue of what exactly the term "conceal[]" means in this context, so I would leave the matter to be properly argued and decided on remand or in another case.

I therefore respectfully dissent from the judgment affirming the dismissal of Olson's claims under subsection (a)(1)(G), his conspiracy claims to the extent they relate to the same alleged violations, see 31 U.S.C. § 3729(a)(1)(C), and his parallel state-law claims, see Minn. Stat. § 15C.02(a)(3), (7). As to the rest, although I disagree with the majority's reasoning and conclusion that Fairview did not act knowingly, I concur in the judgment because violations of subsections (a)(1)(A) and (B) do require fraud, accord Minn. Stat. § 15C.02(a)(1), (2), and Olson does not allege any such fraud with sufficient particularity in his present complaint or his proposed amendments, see Fed. R. Civ. P. 9(b).[20]

---

[20]The Supreme Court's recent decision in Universal Health Services, Inc. v. United States ex rel. Escobar, ___ U.S. ___, 136 S. Ct. 1989, does not affect my evaluation of Olson's claims under subsections (a)(1)(A) and (B), because it addressed a different sort of False Claims Act case. Universal Health was about "implied false certifications," claims for payment that do not say anything untrue but are misleading because of what they leave out, see id. at ___, 136 S. Ct. at 1999-2001, whereas Olson's claims are based on the rule that when a government contract is secured through fraud, claims for payment later submitted under the contract can count as false claims even if they are not fraudulent themselves, see United States ex rel. Simpson v. Bayer Healthcare (In re Baycol Prods. Litig.), 732 F.3d 869, 876 (8th Cir. 2013); cf. United States ex rel. Kraxberger v. Kan. City Power & Light Co., 756 F.3d 1075, 1081 (8th Cir. 2014) (distinguishing between false-certification and fraud-in-the-inducement arguments). Because the fraud that matters for Olson's theory is whatever initially induced the government to enter into the ongoing relationship, see In re Baycol Prods., 732 F.3d 876-77, not any misrepresentations—implicit or explicit—in the claims for payment themselves, the Court's analysis of when such claims can be actionably misleading is irrelevant here.